# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

### CASE NO. 14-2099
_____

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, a corporation existing under the
laws of the United States,

     Plaintiff/Counter-Defendant/Appellant,

v.

ROYAL MANOR APARTMENTS, LLC., a
Michigan limited liability company,

     Defendant/Counter-Plaintiff/Appellee.

_____

**Appeal from the United States District Court for the
Eastern District of Michigan**

**Appellant's Principal Brief**
_____

By:  BODMAN PLC

Dennis J. Levasseur (P39778)
Thomas J. Rheaume, Jr. (P74422)
1901 St. Antoine Street
6th Floor at Ford Field
Detroit, Michigan 48226
dlevasseur@bodmanlaw.com
trheaume@bodmanlaw.com
(313) 259-7777
Attorneys for Appellant

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Pursuant to Rule 26.1 of the Rules of Appellate Procedure, Plaintiff/Counter-Defendant/Appellant Federal National Mortgage Association makes the following disclosures:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?

Answer:    No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Answer:    No.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT REGARDING ORAL ARGUMENT ........................................... vii

JURISDICTIONAL STATEMENT ....................................................... viii

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................x

STATEMENT OF THE CASE.............................................................1

    A. The Loan...................................................................1

    B. Royal Manor Fails to Satisfy its Contractual Obligations on the
       Maturity Date...........................................................3

    C. The Parties' Execute a Pre-Negotiation Agreement to Consider a
       Workout or Restructuring of the Loan ....................................4

    D. Complaint for Injunction and Appointment of Receiver ..........................5

    E. The Foreclosure ..........................................................6

    F. The Redemption ..........................................................7

    G. Royal Manor Challenges the Redemption Price .......................................7

    H. The District Court Denies Fannie Mae's Motion to Dismiss and
       Grants Summary Judgment to Royal Manor..............................8

SUMMARY OF THE ARGUMENT ....................................................11

STANDARD OF REVIEW .............................................................14

ARGUMENT ...........................................................................16

  I. The Unambiguous Late Charge Provision Must be Enforced as
     Written and is not Subject to a Judicial Assessment of
     "Reasonableness" .........................................................16

    A. Unambiguous Contractual Provisions are Applied as Written ...............16

    B. A Court May Not Abrogate Unambiguous Contractual Provisions
       on the Basis of "Reasonableness" ..........................................17

Detroit_4355104_1

C. The Late Charge Provision is Not Contrary to Law or Public Policy ................................................................................20

D. The Late Charge Provision is Not Unconscionable ................................22

E. Even Assuming a Judicial Assessment of Reasonableness is Proper, the Late Charge Provision is Categorically Reasonable.............25

II. Net Operating Income Payments Made Under the Pre-Negotiation Agreement were Applied Properly to Fannie Mae's Attorneys' Fees .........29

A. Royal Manor Agreed to pay Fannie Mae's Attorneys' Fees in Both the Pre-Negotiation Agreement and Loan Documents ...........................29

i. The Pre-Negotiation Agreement ........................................30

a. The Pre-Negotiation Agreement Provided Fannie Mae Absolute Discretion to Apply Net Operating Income Payments to Attorneys' Fees...........................................30

b. The District Court's Finding that the Pre-Negotiation Agreement Did Not Apply is Erroneous.......................................32

ii. The Loan Documents .........................................................35

a. The Loan Documents Obligate Royal Manor to Pay Fannie Mae's Out-of-Pocket Attorneys' Fees and Provide Fannie Mae Discretion to Apply Payments in Any Order........................35

b. Fannie Mae Satisfied All Condition Precedents Under the Loan Documents to Obtain Attorneys' Fees.................................36

III. Default Interest Applied to the Indebtedness Not Paid in Full on the Maturity Date........................................................................38

A. Default Interest Rate Applies ................................................38

CONCLUSION.................................................................................40

CERTIFICATE OF COMPLIANCE.......................................................42

iii

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................14

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) .........................................14

*Camelot Excavating Co., Inc. v. St. Pal Fire & Marie Ins. Co.*, 410 Mich. 117; 301 N.W.2d 275 (1981) ....................................................19

*Cent. Transp., Inc. v. Fruehauf Corp.*, 139 Mich. App. 536; 362 N.W.2d 823 (1984) ..............................................................................32

*Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138; 706 N.W.2d 471 (2005).........................................................................................23

*Curran v. Williams*, 352 Mich. 278; 89 N.W.2d 602 (1958)....................25

*ES & AR Leasing Co. v. The Stoll Companies*, No. 214979, 2001 WL 733446 (Mich. Ct. App. Feb. 23, 2001).............................................20

*Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316 (6th Cir. 2012) .....................................................................................................14

*Gillam v. Michigan Mortgage Inv. Corp.*, 224 Mich. 405; 194 N.W. 981 (1923)...........................................................................................24

*Green v. Trowbridge 1, Inc.*, No. 230349, 2003 WL 21508489 (Mich. Ct. App. July 1, 2003)..........................................................................27

*In re Brunswick Apartments of Trumbull Cnty., Ltd.*, 169 F.3d 333 (6th Cir. 1999)................................................................................27

*In re Smith Trust*, 480 Mich. 19; 745 N.W.2d 754 (2008) ......................16

*Jewett, Bigelow & Brooks v. Detroit Edison Co.*, 274 F. 30 (6th Cir. 1921) .....................................................................................................25

*Lodal, Inc. v. Home Ins. Co. of Illinois*, 156 F.3d 1230 (1998)..............23

*Mayer v. Mylod*, 988 F.2d 635 (6th Cir. 1993).........................................14

*McIntosh v. Groomes*, 227 Mich. 215; 198 N.W. 954 (1924).................16

iv

*McKind v. Palm Investments, L.L.C.*, No. 273137, 2007 WL 1342557 (Mich. Ct. App. May 8, 2007) ............................................................................22

*Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342 (6th Cir. 2005) ........................................................................15

*Mill's Pride, Inc. v. Cont'l. Ins. Co.*, 300 F.3d 701 (6th Cir. 2002) ........................15

*Moore v. St. Clair Co.*, 120 Mich. App. 335; 328 N.W.2d 47 (1982) ....................25

*New Freedom Mtg. Corp. v. Globe Mtg. Corp.*, 282 Mich. App. 63; 761 N.W.2d 832 (2008) ........................................................................34

*P & R Developers, L.L.C. v. Scott T. Bosgraaf Trust U/A/D 2/25/88 ex rel. Bosgraaf*, No. 297439, 2011 WL 6119288 (Mich. Ct. App. Dec. 8, 2011) ........................................................................26

*Papo v. Aglo Restaurants of San Jose, Inc.*, 149 Mich. App. 285; 386 N.W.2d 177 (1986) ........................................................................ 24, 25

*Performance Contracting Inc. v. DynaSteel Corp.*, 750 F.3d 608 (6th Cir. 2014) ........................................................................15

*RBS Citizens v. Purther*, No. 13-12266, 2014 WL 562280 (E.D. Mich. Feb. 13, 2014) ........................................................................22

*Rory v. Continental Ins. Co.*, 473 Mich. 457; 703 N.W.2d 23 (2005) ............ passim

*Senters v. Ottawa Sav. Bank, FSB*, 443 Mich. 45; 503 N.W.2d 639 (1993) ........................................................................34

*Solomon v. Dep't of State Hwys. & Transp.*, 131 Mich. App. 479; 345 N.W.2d 717 (1984) ........................................................................ 19, 26

*St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260; 715 N.W.2d 914 (2006) ........................................................................25

*Terrien v. Zwit*, 467 Mich. 56; 648 N.W.2d 602 (2002) ........................................21

*Tom Thomas Org., Inc. v. Reliance Ins. Co.*, 396 Mich. 588; 242 N.W.2d 396 (1976) ........................................................................19

v

**Statutes**

12 U.S.C. § 1717(a)(2)(B) .................................................................. viii

28 U.S.C. § 1291 ............................................................................. viii

28 U.S.C. § 1332 ........................................................................ viii, 15

M.C.L. § 400.2302(2) .........................................................................24

M.C.L. § 600.3201 .............................................................................34

M.C.L. § 600.3240(2) .........................................................................13

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................14

Fed. R. Civ. P. 56(c) ...........................................................................14

Fed. R. Civ. P. 56(f)(1) .................................................................. 14, 41

**Other Authorities**

15 Corbin, Contracts (Interim ed.), ch. 79, § 1376, p. 17 ........................20

Black's Law Dictionary (9th ed. 2009) .................................................37

Detroit_4355104_1

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant believes that oral argument is warranted because the issues raised in this appeal are significant and concern issues of law and fact that counsel can aid this Court in understanding.  This case involves a sophisticated commercial loan transaction and a subsequent agreement.  There are nuances to the documents associated with the transaction, and the interplay of those documents, particularly when they are considered in reference to Michigan law, which applies to this action.  Accordingly, Appellant requests oral argument.

Detroit_4355104_1

## JURISDICTIONAL STATEMENT

**A.    District Court:** Jurisdiction was proper in the district court under 28 U.S.C. § 1332 because the parties are of diverse citizenship. Plaintiff/Counter-Defendant/Appellant Federal National Mortgage Association ("Fannie Mae") is a District of Columbia corporation existing under the laws of the United States, having its principal place of business in the District of Columbia. 12 U.S.C. § 1717(a)(2)(B). Defendant/Counter-Plaintiff/Appellee Royal Manor Apartments, LLC ("Royal Manor") is a Michigan limited liability company with its registered agent and principal place of business located in Troy, Michigan. All of Royal Manor's members are Michigan citizens.

**B.    Appellate Jurisdiction:** Appellate jurisdiction is based on 28 U.S.C. § 1291, which provides for an appeal as of right of final district court decisions. On July 29, 2014, the district court issued an opinion and order denying Fannie Mae's motion to dismiss and granting Royal Manor's motion for summary judgment. On July 29, 2014, the district court entered a final judgment in Royal Manor's favor.

**C.    Timeliness of Appeal:** Fannie Mae filed its notice of appeal on August 26, 2014, within 30 days of the district court's final order entered on July 29, 2014.

Detroit_4355104_1

**D.**     **<u>Finality</u>:**    The district court's opinion and order together with its

judgment are a final order/judgment that disposed of all remaining claims.

Detroit_4355104_1

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

I.  Whether the district court erred when it abrogated the unambiguous late charge provision of the parties' written contract based on its own independent assessment of reasonableness contrary to Michigan law that provides courts must enforce unambiguous contractual provisions as written?

Fannie Mae Answers: Yes.

Royal Manor Answers:  No.

The District Court Answered:  No.


II.  Whether the district court erred in finding that Royal Manor's post-foreclosure net operating income payments should have been applied to Royal Manor's principal indebtedness when provisions of the parties' contract provide that Fannie Mae, in its sole discretion, could apply the payments to its attorneys' fees incurred in connection with Royal Manor's default?

Fannie Mae Answers: Yes.

Royal Manor Answers:  No.

The District Court Answered:  No.


III.  Whether the default rate of interest, which applied to Royal Manor's balance due after the maturity date under the mortgage, applied during the period between the foreclosure sale and redemption where the applicable Michigan statute mandates that the redemption price include interest at the rate provided for in the mortgage?

Fannie Mae Answers:  Yes.

Royal Manor Answers:  No.

The District Court Answered:  No.

x

# STATEMENT OF THE CASE

## A.    The Loan.

In 2003, Royal Manor borrowed money to purchase an apartment complex in Royal Oak, Michigan.  As part of that transaction, Royal Manor executed a Multifamily Note ("Note") payable to Arbor Commercial Mortgage, LLC.  Note, RE 1-2, Page ID # 12-23.  Royal Manor also granted a Multifamily Mortgage ("Mortgage") on the property as security for the Note.  Mortgage, RE 1-3, Page ID # 25-69.  Thereafter, Arbor Commercial Mortgage assigned the Note and Mortgage (collectively, "Loan Documents") to Fannie Mae.  Assignment of Mortgage, RE 1-4, Page ID # 71-74.

Under the Note, Royal Manor promised to pay Fannie Mae the principal loan balance of $2,000,000 plus interest on the unpaid principal balance.  Note, p. 1, RE 1-2, Page ID # 12.  The Note called for consecutive monthly payments of $11,658.75 beginning April 1, 2003 until the entire balance was satisfied.  *Id*., ¶3(b), Page ID # 12.  The Loan Documents provide that Fannie Mae could apply payments received from Royal Manor to any amount due and payable in its sole discretion when it received an amount which was less than all amounts due and payable at such time.  *Id*., ¶4, Page ID # 15; Mortgage, ¶9, RE 1-3, Page ID # 41. On March 1, 2013, the loan matured and Royal Manor was obligated to pay "[a]ny remaining principal and interest."  Note, ¶3(b), RE 1-2, Page ID # 12.  Relevant to

1

this appeal, the Loan Documents provide for interest payments, late charges, and attorneys' fees in the event that Royal Manor failed to meet its contractual obligations.

The Note provides that interest was payable at the annual rate of 5.74%.  *Id.*, p. 1, Page ID # 12.  The Note also specified a default interest rate for purposes of any payment that was more than 30 days overdue.  *Id.*, ¶7, Page ID # 13.

> **Default Rate.**  So long as any monthly installment or any other payment due under this Note remains past due for 30 days or more, interest under this Note shall accrue on the unpaid principal balance from the earlier of the due date of the first unpaid monthly installment or other payment due, as applicable, at a rate (the "Default Rate") equal to the lesser of 4 percentage points above the rate stated in the first paragraph of this Note or the maximum interest rate which may be collected from Borrower under applicable law.  If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate.  [*Id.*, ¶¶7-8, Page ID # 13-14.]

Royal Manor agreed that "the increase in the rate of interest payable under this Note to the Default Rate represents a fair and reasonable estimate, taking into account all circumstances existing on the date of this Note, of the additional costs and expenses Lender will incur by reason of the Borrower's delinquent payment and the additional compensation Lender is entitled to receive for the increased risks of nonpayment associated with a delinquent loan." *Id*.

The Note also provided for a late charge if any payment was more than ten days overdue:

2

**Late Charge**.  If any monthly installment due hereunder is not received by Lender on or before the 10th day of each month or if any other amount payable under this Note or under the Security Instrument or any other Loan Document is not received by Lender within 10 days after the date such amount is due . . . Borrower shall pay to Lender, immediately and without demand by Lender, a late charge equal to 5 percent of such monthly installment or other amount due . . . .  [*Id*., ¶7, Page ID # 13.]

The late charge was payable in addition to any interest payable at the default interest rate.  *Id.*  Royal Manor agreed that "the late charge payable pursuant to this Paragraph represents a fair and reasonable estimate taking into account all circumstances existing on the date of this Note, or the additional expenses Lender will incur by reason of such late payment."  *Id*.

Finally, the Note provided that Royal Manor was obligated to pay Fannie Mae's actual attorneys' fees "as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents . . . ."  *Id*., ¶11, RE 1-2, Page ID # 16.

### B.   <u>Royal Manor Fails to Satisfy its Contractual Obligations on the Maturity Date.</u>

On March 1, 2013, the Note matured and all remaining indebtedness was due.  *Id*., ¶9, Page ID # 14.  As of the maturity date, the outstanding principal balance was $1,687,701.78. Foreclosure Bid Calculation, RE 20-8, Page ID # 648. Royal Manor did not pay its remaining indebtedness on the maturity date.  On

3

March 11, 2013, Fannie Mae issued a Demand Letter to Royal Manor.  Demand Letter, RE 1-5, Page ID # 76-80.  The Demand Letter constituted formal notice to Royal Manor of its default and of Fannie Mae's demand for immediate payment of all indebtedness, plus interest, costs, and attorneys' fees.  *Id.*, pp.1-2, Page ID # 76-77.  Royal Manor did not pay its indebtedness in response to the Demand Letter.  Royal Manor's default entitled Fannie Mae to, among other things, foreclose the Mortgage by advertisement.  Mortgage, ¶¶22(a), 43, RE 1-3, Page ID # 57, 64.

### C.    The Parties' Execute a Pre-Negotiation Agreement to Consider a Workout or Restructuring of the Loan.

In March 2013, Royal Manor was desirous of potentially working out or restructuring the Loan.  As part of that process, Royal Manor and Fannie Mae executed a Pre-Negotiation Agreement wherein Royal Manor acknowledged that it was "in default under the Loan Documents and that Fannie Mae is entitled to exercise any and all rights and remedies set forth in the Loan Documents, at law or in equity.  Pre-Negotiation Agreement, p. 3, RE 15-4, Page ID # 486.  Royal Manor also acknowledged that "each of the Loan Documents is valid, fully enforceable in accordance with its terms, and evidences legal and binding obligations which are in full force and effect."  *Id.*, p. 4, Page ID # 487.

Under the Pre-Negotiation Agreement, Royal Manor agreed to pay Fannie Mae net operating income from the property in exchange for Fannie Mae engaging in discussions concerning a potential workout or restructuring of the loan.  *Id.*, p. 3,

Detroit_4355104_1

Page ID # 486.  Royal Manor explicitly agreed that Fannie Mae could use those payments:

> [I]n any order and **for any purpose** which is related directly or indirectly to the Loan Documents or to the Property including, without limitation, the payment of attorney's fees or other charges incurred by Fannie Mae . . . or any other purpose determined by Fannie Mae in its sole and absolute discretion, and in accordance with the Loan Documents.  [*Id*., p. 4, Page ID # 487 (emphasis added).]

While the parties were engaged in discussions concerning a potential workout or restructuring of the loan, Fannie Mae pursued its available remedies in accordance with the Loan Documents.[1]

### D.    Complaint for Injunction and Appointment of Receiver.

In June 2013, Fannie Mae filed a complaint in United States District Court for the Eastern District of Michigan for the appointment of a receiver and the issuance of a preliminary injunction with respect to the property. Fannie Mae's Verified Complaint, RE 1, Page ID # 1-80.  In its complaint, Fannie Mae explained that due to Royal Manor's default, it was concerned that Royal Manor would fail to maintain the property such that the value of its security interest would be jeopardized.  *Id*., at ¶22, Page ID # 5.  Royal Manor expressly consented to the

---

[1]  The Pre-Negotiation Agreement provides that Fannie Mae could pursue "parallel paths," meaning that it could concurrently pursue its rights and remedies under the Loan Documents *and* evaluate and negotiate a possible workout or restructuring of the loan.  Pre-Negotiation Agreement, p. 2, RE 15-4, Page ID # 485.

5

appointment of a receiver in the Mortgage.  Mortgage, ¶3(d), RE 1-3, Page ID # 37.

### E.    The Foreclosure.

Fannie Mae foreclosed the mortgage by advertisement and purchased the property at the foreclosure sale with a credit bid of $1,740,860.42.  Sheriff's Deed on Foreclosure Sale, RE 20-5, Page ID # 628-637.  The $1,740,860.42 bid amount was calculated by adding the principal balance owed ($1,687,701.78), interest at the rate of 5.74% ($42,516.96), default interest at the rate of 4% ($24,377.91), the applicable late charge ($84,761.82), and allowable costs, less certain escrows and reserves held by Fannie Mae.[2]  Foreclosure Bid Calculation, RE 20-8, Page ID # 648.

Subsequently, Royal Manor made two net operating income payments to Fannie Mae under the Pre-Negotiation Agreement.[3]  Those payments totaled $29,219.84 and were, as allowed by the Pre-Negotiation Agreement and the Loan Documents, applied directly to the payment of Fannie Mae's attorneys' fees

---

[2] The statutory attorney fee of $75 was the only attorney fee included in the costs for purposes of calculating the bid amount.  Foreclosure Bid Calculation, RE 20-8, Page ID # 648.

[3] Following the foreclosure sale and a status conference with the district court relating to Fannie Mae's request for appointment of a receiver, "Royal Manor agreed to continue making NOI payments to Fannie Mae per the terms of the Pre-Negotiation Agreement."  Royal Manor's Motion for Summary Judgment, p. 4, RE 20, Page ID # 524; *see also*, Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, ¶48, RE 15, Page ID # 412.

Detroit_4355104_1

associated with Royal Manor's default. Royal Manor's Counterclaim, RE 15, ¶¶48, 49, Page ID # 412-413.

**F.    The Redemption.**

Fannie Mae filed an affidavit as to amounts needed for redemption with the County Register of Deeds.  Affidavit as to Amounts Needed for Redemption, RE 20-6, Page ID # 639-641.  The affidavit stated that the property may be redeemed by paying the amount bid at the foreclosure sale ($1,740,860.42) plus interest at the default rate of 9.74% from the date of the foreclosure sale until the date of redemption.  *Id.*

Royal Manor redeemed the property by paying $1,758,513.22.[4]  Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, RE 15, ¶23, Page ID # 407.  The $1,758,513.22 represented the sum bid at the foreclosure sale ($1,740,860.42) plus interest at the rate of 9.74%, which amounted to $17,652.80.  *Id.*

**G.    Royal Manor Challenges the Redemption Price.**

Following its redemption, Royal Manor filed a counterclaim alleging that the

---

[4] Royal Manor's redemption of the property obviated the need for Fannie Mae's complaint.  Fannie Mae dismissed its complaint on October 30, 2013.  Stipulated Order of Dismissal Without Prejudice of Fannie Mae's Complaint and Counts III and IV of Royal Manor's Counterclaim Only, RE 24, Page ID # 1179-1180.

Detroit_4355104_1

redemption price was overstated on three grounds.[5]  *See*, *id*, Page ID # 387-422.

**First**, Royal Manor claimed that despite its explicit agreement to the late charge provision, it was unreasonable and, therefore, unenforceable.  *Id*., ¶32, Page ID # 409.  **Second**, Royal Manor alleged that Fannie Mae incorrectly applied the two post-foreclosure net operating income payments of $29,219.84 to pay its attorneys' fees instead of applying those fees to Royal Manor's principal indebtedness.  *Id*., ¶¶36-37, Page ID # 409-410.  **Third**, Royal Manor claimed that Fannie Mae improperly applied the default interest rate of 9.74% instead of the non-default rate of 5.74% for the period following the foreclosure sale until redemption.  *Id*., ¶47, Page ID # 412.  In total, Royal Manor claimed that the redemption price was overstated by $122,008.37.  *See generally*, *id*.

**H.    The District Court Denies Fannie Mae's Motion to Dismiss and Grants Summary Judgment to Royal Manor.**

Fannie Mae immediately moved to dismiss Royal Manor's counterclaim pursuant to Rule 12(b)(6).  In its motion, Fannie Mae explained that it calculated the redemption amount properly under the unambiguous terms of the parties' contracts.  Fannie Mae's Motion to Dismiss Royal Manor's Counterclaims, RE 21,

---

[5]  As initially pled, Royal Manor raised causes of action for Reformation and Unjust Enrichment.  Royal Manor agreed to dismiss these two causes of action after Fannie Mae filed its Rule 12(b)(6) motion.  Stipulated Order of Dismissal Without Prejudice of Fannie Mae's Complaint and Counts III and IV of Royal Manor's Counterclaim Only, RE 24, Page ID # 1179-1180.

Detroit_4355104_1

Page ID # 750-892.  Therefore, Fannie Mae argued that Royal Manor's pleadings did not plausibly suggest that it was entitled to relief.  *Id.*  Concomitantly, Royal Manor filed its motion for summary judgment on its counterclaims.  Royal Manor's Motion for Summary Judgment, RE 20, Page ID # 509-749.

On July 29, 2014, the district court denied Fannie Mae's motion to dismiss and granted Royal Manor's summary judgment motion.  Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, RE 31, Page ID # 1254-1270.  As to Fannie Mae's motion, the district court simply held that the allegations in Royal Manor's complaint were "sufficient to put Fannie Mae on notice."  *Id.*, p. 9, Page ID # 1262.  The district court went on to find that Royal Manor was entitled to summary judgment.  The district court found the late charge provision unenforceable.  *Id.*, p. 14, Page ID # 1267.  The court held that although the late charge provision was unambiguous, the late charge itself was "unreasonable" and therefore had to be stricken from the parties' unambiguous contract.  *Id.*, p. 1, Page ID # 1254.

The district court also concluded that Fannie Mae's application of Royal Manor's two post-foreclosure sale net operating income payments to its attorneys' fees was improper.  *Id.*, pp. 14-16, Page ID # 1267-1269.  *Sua sponte*, the district court determined that the Pre-Negotiation Agreement – the same agreement under which Royal Manor made the two post-foreclosure payments – was not the

Detroit_4355104_1

controlling document and therefore could not validate Fannie Mae's application of net operating income payments to attorneys' fees.  *Id.*, p. 15, Page ID # 1268.  Similarly, the district court concluded that the attorneys' fee provision in the Note was inapplicable because Fannie Mae "never made a request for attorneys' fees" or filed a "motion for attorneys' fee." *Id.*

Finally, without analysis, the district court concluded that Royal Manor was improperly charged the default interest rate of 9.74% for the period following the foreclosure sale until the redemption date.  *Id.*, Page ID # 1269.  In total, the district court awarded Royal Manor $122,008.37.  *Id.*  A final judgment was entered on July 29, 2014.  Judgment, RE 32, Page ID # 1271.  Fannie Mae timely filed its notice of appeal on August 26, 2014.  Notice of Appeal, RE 33, Page ID # 1272.

Detroit_4355104_1

## SUMMARY OF THE ARGUMENT

The parties' commercial loan transaction is governed by contracts executed by the parties. The contracts provide for late charges, attorneys' fees, and default interest in the event of a default. Royal Manor defaulted on its loan obligations and, under the parties' contracts, Fannie Mae assessed late charges, attorneys' fees, and default interest. Royal Manor's challenge to the assessments should have been dismissed for failure to state a claim upon which relief can be granted as the challenged actions are expressly contemplated and allowed by the parties' contracts.

The contracts unambiguously provide that a late charge will be assessed if any amount payable, including the maturity payment, is not timely paid. Note, ¶7, RE 1-2, Page ID # 13. Consequently, when Royal Manor defaulted by not paying the principal balance due at maturity, Fannie Mae had the contractual right to assess a late charge. Royal Manor's challenge to the application of the late charge does not state a claim upon which relief can be granted. Under well settled Michigan law, unambiguous contracts are not open to judicial construction and must be enforced as written. *Rory v. Continental Ins. Co.*, 473 Mich. 457, 468; 703 N.W.2d 23 (2005). Royal Manor's attempt and the district court's decision to rewrite the parties' contract based on the perceived unreasonableness of the late charge provision are invalid. Michigan law clearly provides that a judicial

11

assessment of "reasonableness" is "an invalid basis upon which to refuse to enforce contractual provisions." *Id*. at 470. And where, as here, the contractual provision does not violate law or public policy, it must be enforced as written. *Id*.

The parties' Pre-Negotiation Agreement, executed post default, obligated Royal Manor to remit net operating income payments from the property to Fannie Mae. Pre-Negotiation Agreement, RE 15-4, Page ID # 486-487. That agreement also provides that Fannie Mae could, in its sole and absolute discretion, apply the payments in any order and for any purpose, including the payment of attorneys' fees. *Id*. Royal Manor made two net operating income payments under that agreement and Fannie Mae applied them to its outstanding attorneys' fees. Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, p 48, RE 15, Page ID #412. Fannie Mae's application of the payments to attorneys' fees was within its discretion as provided by the Pre-Negotiation Agreement. Royal Manor's unsupported claim that these payments should have been applied to pay down its principal indebtedness is not plausible on its face. The Pre-Negotiation Agreement, and the underlying Loan Documents, definitively and conclusively give Fannie Mae the right to apply such payments to attorneys' fees.

Finally, Royal Manor's objections to the interest calculated during the redemption period are ill-founded. Michigan law provides that the interest charged

12

during this period includes interest from the date of the foreclosure sale "at the interest rate provided for by the mortgage . . . ." M.C.L. 600.3240(2). Here, the Mortgage, by incorporation of the Note, provided that the interest rate payable on any amount not paid in full as of the maturity date was the default interest rate of 9.74%. Note, RE 1-2, Page ID # 13. Because Royal Manor remained in default through the redemption period, Fannie Mae applied the default rate of interest. Affidavit as to Amounts Needed for Redemption, RE 20-6, Page ID # 639-641. It is implausible that some other rate would apply during this period.

Accordingly, Fannie Mae is entitled to dismissal for failure to state a claim upon which relief can be granted, and the district court's grant of summary judgment in favor of Royal Manor should be reversed.

Detroit_4355104_1

## **STANDARD OF REVIEW**

This Court reviews *de novo* the district court's ruling on a Rule 12(b)(6) motion. *Mayer v. Mylod*, 988 F.2d 635, 637 (6th Cir. 1993). Rule 12(b)(6) provides a defense for a party's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer*, 988 F.2d at 638. To avoid dismissal, a pleading must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting*, *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Legal conclusions must be supported by factual allegations. *Ashcroft*, 556 U.S. at 664.

This Court reviews a district court's grant of summary judgment *de novo*. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Summary judgment is proper if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c). A court may grant summary judgment to a nonmoving party if there is no genuine issue as to any material fact and the nonmoving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(f)(1).

Questions involving statutory interpretation and the proper interpretation of a contract are also reviewed *de novo*. *Performance Contracting Inc. v. DynaSteel*

14

*Corp.*, 750 F.3d 608, 611 (6th Cir. 2014); *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 346 (6th Cir. 2005).

This Court's jurisdiction is based on diversity of citizenship. Thus, under 28 U.S.C. § 1332, this Court applies the law of the forum state regarding matters of contract law. *Mill's Pride, Inc. v. Cont'l. Ins. Co.*, 300 F.3d 701, 704 (6th Cir. 2002). Here, Michigan law applies.

Detroit_4355104_1

# ARGUMENT

## I.    The Unambiguous Late Charge Provision Must be Enforced as Written and is not Subject to a Judicial Assessment of "Reasonableness".

### A.    Unambiguous Contractual Provisions are Applied as Written.

"The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.  To this rule all others are subordinate." *McIntosh v. Groomes*, 227 Mich. 215, 218; 198 N.W. 954 (1924).  To ascertain the intention of the parties we must examine the language of the contract.  *In re Smith Trust*, 480 Mich. 19, 24; 745 N.W.2d 754 (2008).  "If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *Id.*

Here, the late charge provision is unambiguous and indisputably applies to the maturity payment.  The late charge provision provides:

> **Late Charge**.  If any monthly installment due hereunder is not received by Lender on or before the 10th day of each month or **if any other amount payable under this Note** or under the Security Instrument or any other Loan Document **is not received by Lender within 10 days after the date such amount is due** . . . **Borrower shall pay to Lender**, immediately and without demand by Lender, **a late charge equal to 5 percent of such monthly installment or other amount due** . . . .  [Note, ¶7, RE 1-2, Page ID # 13 (emphasis added).]

The Note provides that the loan matured on March 1, 2013, and Royal Manor was obligated to pay "[a]ny remaining principal and interest."  *Id.*, ¶3(b), Page ID # 12. In contrast to a "monthly installment," the payment due at maturity undoubtedly

16

constitutes an "other amount payable" for purposes of the late charge provision. On the maturity date, Royal Manor's remaining principal and interest was $1,687,701.78. Foreclosure Bid Calculation, RE 20-8, Page ID # 648. Royal Manor failed to pay its remaining indebtedness before the 10th day of March 2013. Therefore, under the unambiguous late charge provision, Royal Manor was obligated to pay Fannie Mae a "late charge equal to 5 percent" of the remaining principal and interest. It follows that Fannie Mae properly included the applicable late charge of $84,761.82 in its foreclosure bid amount. *See*, Foreclosure Bid Calculation, RE 20-8, Page ID # 648.

### B.  A Court May Not Abrogate Unambiguous Contractual Provisions on the Basis of "Reasonableness".

The district court agreed that the late charge provision applied to the maturity payment. Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 13, RE 31, Page ID # 1266 ("In reading the Loan Documents in their entirety, there can be only one reasonable meaning of the Late Charge provision: it applies to installments and the maturity payment."). Yet, the district court refused to apply the unambiguous provision because, in its judgment, the provision was "unreasonable." *Id*., p. 13-14, Page ID # 1266-1267. Finding the provision "unreasonable," the district court concluded that "[t]he Late Charge provision is stricken from the Loan. Fannie Mae was not entitled to apply the late charge and default interest to the maturity payment." *Id*.,

17

p. 14, Page ID # 1267.   The district court's decision to rewrite the parties' unambiguous contract is antithetical to Michigan law.

Michigan's contract interpretation jurisprudence is clear – "unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory*, 473 Mich. at 468 (emphasis in the original).   "Courts enforce contracts according to their unambiguous terms because doing so respects the freedom of individuals freely to arrange their affairs via contract." *Id.*  When an agreement is voluntarily and fairly made, it "shall be held valid and enforced in the courts." *Id.* (citations omitted).   An unambiguous contract provision "is to be enforced as written unless the provision would violate law or public policy." *Id.* at 470. Further, "[o]nly recognized traditional contract defenses may be used to avoid the enforcement of the contract provision." *Id.*

A judicial assessment of "reasonableness" is "an invalid basis upon which to refuse to enforce contractual provisions." *Id.*  As the Michigan Supreme Court explained, when, as here, "a court abrogates unambiguous contractual provisions based on its own independent assessment of 'reasonableness,' the court undermines the parties' freedom of contract." *Id.* at 468-469.  Moreover, the notion that a contractual provision can be reviewed for "reasonableness" is contrary to the bedrock principle of American law that contracts will be enforced as written:

18

This approach, where judges rewrite the contract is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstances such as a contract in violation of law or public policy . . . The notion that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art. I, § 10, cl. 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society. [*Id.* at 469 (citations omitted).]

The district court did precisely what Michigan law prohibits – it judicially assessed the late charge provision for "reasonableness." Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 13, RE 31, Page ID # 1266 (citing case law for the proposition that a liquidated damages provision will only be upheld if it is "reasonable").[6] Then, after judicially declaring the provision to be "unreasonable," the district court took

_____

[6] For this proposition, the district court cited the Michigan case of *Solomon v. Dep't of State Hwys. & Transp.*, 131 Mich. App. 479, 484; 345 N.W.2d 717 (1984), a pre-*Rory* decision. At the time *Solomon* was decided, arguably "reasonableness" may have been a sufficient basis upon which to invalidate an unambiguous contractual provision. *See*, *Camelot Excavating Co., Inc. v. St. Pal Fire & Marie Ins. Co.*, 410 Mich. 117; 301 N.W.2d 275 (1981) and *Tom Thomas Org., Inc. v. Reliance Ins. Co.*, 396 Mich. 588; 242 N.W.2d 396 (1976). But, *Solomon* is no longer valid authority. The Michigan Supreme Court made clear in *Rory* that to the extent "*Tom Thomas, Camelot*, and their progeny abrogate unambiguous contractual terms on the basis of reasonableness determinations, they are overruled." *Rory*, 473 Mich. at 470.

19

it upon itself to rewrite the parties' contract. *Id.*, p. 14, Page ID # 1267 ("The Late Charge provision is stricken from the Loan."). In doing so, the district court plainly disregarded Michigan's contract law.[7] Accordingly, the district court's ruling should be vacated and the unambiguous late charge provision applied. To hold otherwise, is to trample the parties' liberty of contract. *Rory*, 473 Mich. at 469-470, quoting 15 Corbin, Contracts (Interim ed.), ch. 79, § 1376, p. 17 ("One does not have 'liberty of contract' unless organized society both forbears and enforces, forbears to penalize him for making his bargain and enforces it after it is made.").

### C.    The Late Charge Provision is Not Contrary to Law or Public Policy.

While Michigan law provides that a judicial assessment of reasonableness is an invalid basis upon which to invalidate an unambiguous contractual provision,

---

[7] The district court's indifference to Michigan law is exemplified by its statement that, although the Note unambiguously provides that the late charge and default interest apply, "Fannie Mae was not entitled to apply the late charge and default interest to the maturity payment." Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, RE 31, Page ID # 1267. In Michigan, there is no law to support the position that late fees and interest cannot be applied. *ES & AR Leasing Co. v. The Stoll Companies*, No. 214979, 2001 WL 733446 (Mich. Ct. App. Feb. 23, 2001). Further, Fannie Mae's "entitlement" to apply the late charge and default interest is supported by the parties' unambiguous contracts and buttressed by the United States Constitution.

Detroit_4355104_1

the provision will not be enforced if it "violates law or public policy."[8]  *Rory*, 473 Mich. at 470.  The late charge provision does not violate law as there is no Michigan statute explicitly prohibiting a 5% late charge on outstanding indebtedness due at maturity.

Nor does the late charge provision violate public policy.  Public policy is not merely the equivalent of the personal preferences of the judiciary.  *Terrien v. Zwit*, 467 Mich. 56, 66; 648 N.W.2d 602 (2002).  Rather, public policy refers to "policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law."  *Id.* at 66-67.  There must be some "definite indications in the law" to justify the invalidation of a contractual provision as contrary to public policy.  *Id.* at 68.   In other words, such policy must "ultimately be clearly rooted in the law."  *Id*. at 67.

Here, there is no definite indication in our state or federal constitutions, our statutes, or the common law that a 5% late charge provision is unenforceable. Undeniably, as explained, the public policy of Michigan is that the provision is enforceable.  That is, there is a definite indication in the law that an agreement voluntarily and fairly made will be held valid and enforced by the courts.  *Rory*,

---

[8] The district court did not consider whether the late charge provision violates law or public policy.  Absent a traditional contract defense, which Royal Manor does not plead, the late charge provision can only be invalidated on those grounds.

Detroit_4355104_1

473 Mich. at 468. No further analysis is required or allowed. *See e.g.*, *McKind v. Palm Investments, L.L.C.*, No. 273137, 2007 WL 1342557 (Mich. Ct. App. May 8, 2007) (holding that the court was obligated to enforce the contracts liquidated damages provisions, which called for a total of $200,000 in liquidated damages, in the absence of a showing that a traditional contract defense such as fraud, duress, unconscionability, or waiver applied); and *RBS Citizens v. Purther*, No. 13-12266, 2014 WL 562280 (E.D. Mich. Feb. 13, 2014) (finding that pursuant to the unambiguous terms of their guaranty agreement, the guarantors were responsible for their respective portions of the outstanding indebtedness on a note, which included, among other things, a $60,855.98 late charge on a $1,125,360.60 principal balance due at maturity).

Accordingly, the district court's failure to follow Michigan's public policy that unambiguous contracts must be enforced as written constitutes reversible error. Royal Manor was properly charged a late fee on the outstanding balance due at maturity.

**D.    The Late Charge Provision is Not Unconscionable.**

Michigan law also holds that unambiguous contractual provisions are subject to traditional contract defenses. *Rory*, 473 Mich. at 470. Traditional contract defenses include duress, waiver, estoppel, fraud, or unconscionability. *Id.* at 470 n. 1. Royal Manor has not pled that a traditional contract defense applies to

22

enforcement of the late charge provision. But, even if Royal Manor's pleadings or the district court's opinion can be construed as contending that the late charge provision is unconscionable, the notion may be quickly dispelled.

In order for a contractual provision to be considered unconscionable, both procedural and substantive unsconscionability must be shown. *See*, *Clark v. DaimlerChrysler Corp.*, 268 Mich. App. 138, 143; 706 N.W.2d 471 (2005). "Procedural unsconscionability" exists where a party had no realistic alternative to acceptance of the term. *Id*. at 144. If the party challenging a term was free to accept or reject the term, there is no procedural unsconscionability. *Id*. "Substantive unsconscionability exists where the challenged term is not substantively reasonable." *Id*. In order to be substantively unreasonable, "the inequity of the term must be so extreme as to shock the conscience." *Id*.

Royal Manor – a sophisticated commercial entity – was free to accept or reject the late charge provision. Indeed, Royal Manor was free to accept or reject the Note in its entirety. Thus, the late charge provision cannot be considered procedurally unsconscionable. *See*, *Lodal, Inc. v. Home Ins. Co. of Illinois*, 156 F.3d 1230 (1998) (holding that no procedural unsconscionability existed where the plaintiff did not allege that it could not obtain insurance from another source or that it had no other alternatives but to agree to the insurance policy at issue).

Further, the late charge provision is not so extreme that it shocks the

conscience. Royal Manor borrowed $2 million dollars to finance the purchase of an apartment complex that it operated for profit. A late charge of just 5% on any delinquent payment is commercially reasonable. *See*, *Papo v. Aglo Restaurants of San Jose, Inc.*, 149 Mich. App. 285, 294-295; 386 N.W.2d 177 (1986) (holding that a contractual provision for 18% interest on payments not made when due is "a reasonable figure upon which the parties could agree"). The failure to timely pay debt obligations causes additional expenses in servicing and processing the loan. Where, as here, the majority of the indebtedness remains outstanding at maturity, significant expenses will be incurred to secure the collateral. Untimely payment also prevents capital from being reinvested in other commercial transactions.

Moreover, Royal Manor read the provision, but did not exclaim as to its inequality. *Gillam v. Michigan Mortgage Inv. Corp.*, 224 Mich. 405, 409; 194 N.W. 981 (1923) (unconscionability requires "an inequality so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it"). Instead, Royal Manor agreed that it was fair and reasonable. *See*, Note, ¶3(b), RE 1-2, Page ID # 13. Thus, it cannot be said that the late charge is substantively unconscionable.[9]

---

[9] Even assuming the district court was inclined to find the provision unconscionable, summary judgment was improper because the district court was required by Michigan law to afford the parties the opportunity "to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." M.C.L. § 400.2302(2).

Detroit_4355104_1

**E.    Even Assuming a Judicial Assessment of Reasonableness is Proper, the Late Charge Provision is Categorically Reasonable.**

Assuming *arguendo* that a judicial assessment of reasonableness is proper, the late charge provision must be upheld.  Regarding the "reasonableness" of a liquidated damages provision pre-*Rory*,[10] Michigan law provides:

> It is a well-settled rule in this State that the parties to a contract can agree and stipulate in advance as to the amount to be paid in compensation for loss or injury which may result in the event of a breach of the agreement. Such a stipulation is enforceable, particularly where the damages which would result from a breach are uncertain and difficult to ascertain at time [the] contract is executed. If the amount stipulated is reasonable with relation to the possible injury suffered, the courts will sustain such a stipulation.  [*Moore v. St. Clair Co.*, 120 Mich. App. 335, 340; 328 N.W.2d 47 (1982), *quoting*, *Curran v. Williams*, 352 Mich. 278, 286-287; 89 N.W.2d 602 (1958).]

The validity of a liquidated damages clause depends on conditions existing when

---

[10]    It is perhaps an open question post-*Rory* whether a liquidated damages provision may be assessed under the more lenient reasonableness standard as opposed to the more exacting unconscionability standard.  In any event, that question need not be decided in this case because "liquidated damages" means "a definite sum or amount" that has been determined by agreement of the parties. *Jewett, Bigelow & Brooks v. Detroit Edison Co.*, 274 F. 30, 31 (6th Cir. 1921).  A contractual provision that provides for a $40,000 payment in the event of a breach constitutes a liquidated damages provision.  *See*, *e.g.*, *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260; 715 N.W.2d 914 (2006).  A late charge – calculated as 5% of any delinquent payment – is not a liquidated damages provision because it is not "a definite sum or amount."  *Papo*, 149 Mich. App. at 294-294 (holding that a contractual provision calling for interest at the rate of 18% on past due amounts did not constitute a liquidated damages provision).  Thus, the late charge provision, if it is to be reviewed at all, must be analyzed under the traditional contract defense of unconscionability.

the contract was signed rather than at the time of the breach. *Solomon*, 131 Mich. App. at 484.

Royal Manor borrowed $2 million dollars to finance the purchase of a large apartment complex that it operated for profit. *See*, Note, RE 1-2, Page ID # 12. The Note was secured only by a mortgage on the property. None of Royal Manor's members personally guaranteed the Note. For ten years, Royal Manor's obligations were limited to making minimal payments towards the principal balance of the loan. *Id.*, ¶3, Page ID # 15 (requiring monthly installments of just $11,658.75). During that period, Royal Manor also had the option to make additional payments or pay the loan off in its entirety before maturity. *Id.*, ¶10, Page ID # 15.

The parties agreed in 2003 that the applicable late charge applied to the remaining balance would be a function of the amount of the payment that was due. That is, the higher the remaining balance due at maturity, the higher the late charge in the event of untimely payment. Conversely, the lower the remaining balance due at maturity, the lower the late charge. This is commercially reasonable. *See*, *P & R Developers, L.L.C. v. Scott T. Bosgraaf Trust U/A/D 2/25/88 ex rel. Bosgraaf*, No. 297439, 2011 WL 6119288 (Mich. Ct. App. Dec. 8, 2011) (holding that a five percent late fee that amounted to $42,500, is reasonable with regard to the possible injury that may be suffered as a result of the defendant's failure to pay its

Detroit_4355104_1

outstanding balance on the due date).[11]

At the time of contracting in 2003, the damages Fannie Mae would sustain if Royal Manor failed to pay its remaining indebtedness at the time of maturity were uncertain and difficult to ascertain.  If, on the one hand, Royal Manor made only required monthly installments of principal and interest, the remaining balance on the Note would be high, which logically would increase Fannie Mae's risk of not recouping its capital in full.  In 2003, collection costs and the value of the collateral at maturity were not certain.    Together with the fact that recouping the indebtedness from the members of Royal Manor was constrained to the occurrence of certain activities such as fraud,[12] it was entirely reasonable that the parties' agreed to a higher late charge in the event of nonpayment.  If, on the other hand,

---

[11] The district court's reliance on the cases of *Green v. Trowbridge 1, Inc.*, No. 230349, 2003 WL 21508489 (Mich. Ct. App. July 1, 2003) and *In re Brunswick Apartments of Trumbull Cnty., Ltd.*, 169 F.3d 333 (6th Cir. 1999) in its reasonableness analysis is misplaced. Both cases concerned contract interpretation, not the reasonableness of a 5% late charge.  For example, in *In re Brunswick Apartments of Trumbull Cnty.*, this Court held that a 5% late fee did not apply to the payment due at maturity because the unambiguous language of the note provided that the charge applied only to installment payments, which was defined to exclude the maturity payment.  The Michigan Court of Appeals in *Green* relied on this Court's decision for the same proposition.  *Green, surpa,* ("We reject defendant's argument that the balloon payment is 'merely one of many' installment payments, thereby warranting a five percent late fee.").  Here, in contrast, the late charge unambiguously applied to the maturity payment.  Note, ¶7, Page ID # 13.

[12] *See*, Note, ¶9, RE 1-2, Page ID # 14-15.

Detroit_4355104_1

Royal Manor had paid more than its minimum monthly installments, Fannie Mae's risk of not recouping its capital would be diminished commensurate with the additional payments.  In that situation, costs associated with collecting the remaining indebtedness, while uncertain, would presumably be lower.  Thus, it was equally reasonable for the parties to provide for a lower late charge in the event of nonpayment.

For these reasons, as opposed to a sum certain (*e.g.*, $100,000) in the event of any breach, the parties agreed to vary the late charge as a function of the remaining indebtedness.  Indeed, Royal Manor even expressly agreed that the late charge provision represented "a fair and reasonable estimate, taking into account all the circumstances existing on the date of this Note, of the additional expenses [Fannie Mae] will incur by reason of such late payment."  Note, ¶7, RE 1-2, Page ID # 13.  Having stipulated to the reasonableness of the late charge provision in 2003, reaffirming that stipulation 10 years later,[13] and having reaped the benefit of employing $2 million of Fannie Mae's capital for more than 10 years to run a for-profit entity, Royal Manor should not be heard to complain post hoc that the late charge is unreasonable.  After all, whether the late charge even applied was entirely within Royal Manor's control.  Thus, under the circumstances, the 5% late

---

[13] Pre-Negotiation Agreement, p. 4, ¶7, RE 15-4, Page ID # 487.

28

charge was, and is, reasonable.[14]

## II.    Net Operating Income Payments Made Under the Pre-Negotiation Agreement were Applied Properly to Fannie Mae's Attorneys' Fees.

### A.    Royal Manor Agreed to pay Fannie Mae's Attorneys' Fees in Both the Pre-Negotiation Agreement and Loan Documents.

Following Royal Manor's default, and in consideration for Fannie Mae discussing a potential workout or restructuring of the loan, Royal Manor agreed to remit "all of the net operating income from the Property" to Fannie Mae. Pre-Negotiation Agreement, p. 3, ¶5, RE 15-4, Page ID # 486-487. Following the foreclosure sale, Royal Manor made two net operating income payments to Fannie Mae pursuant to the Pre-Negotiation Agreement.[15] Those payments totaled

---

[14] The district court observed that the late charge applied to a missed monthly installment is "far less" than the large charge applied to Royal Manor's remaining indebtedness due at maturity. Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 14, RE 31, Page ID # 1267. But, the district court's extrapolation that this comparison makes the late charge presumptively unreasonable when applied to the maturity payment is superficial. A missed monthly installment will cause additional, but limited, costs in servicing and processing the loan. The costs associated with a missed maturity payment, on the other hand, will presumably dwarf the costs associated with a missed monthly installment. This fact was anticipated in 2003 and experienced in 2013. That is, Royal Manor's failure to pay its indebtedness at maturity was not simply cured by a reminder letter or phone call, but by extensive legal proceedings, including a foreclosure action and a complaint for the appointment of a receiver and an injunction. These proceedings have cost more in attorneys' fees than the actual late charge itself, even before considering Fannie Mae's employees' lost time and expense.

[15] Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, ¶48, RE 15, Page ID # 412 ("Fannie Mae also failed to credit Royal

Detroit_4355104_1

$29,219.84 and were applied to the payment of Fannie Mae's attorneys' fees associated with Royal Manor's default. Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, ¶¶48-49, RE 15, Page ID # 412-413. Royal Manor claims that these payments should have been applied to its principal indebtedness rather than applied directly to pay Fannie Mae's attorneys' fees. Royal Manor's argument is belied by the express terms of both the Pre-Negotiation Agreement and the Loan Documents.

### i.    **The Pre-Negotiation Agreement**.

#### a.    **The Pre-Negotiation Agreement Provided Fannie Mae Absolute Discretion to Apply Net Operating Income Payments to Attorneys' Fees**.

The Pre-Negotiation Agreement is a separate and distinct contract from the Loan Documents. It was premised on different consideration. That is, in agreeing to the Pre-Negotiation Agreement, the parties made new and mutually binding promises to each other. Fannie Mae agreed to discuss a potential workout or restructuring plan for the loan. Pre-Negotiation Agreement, p. 1, RE 15-4, Page ID # 484. In exchange, Royal Manor agreed to remit all net operating income from the property. *Id.*, ¶5, Page ID # 486-487. There is no promise in the Pre-

---

Manor for payments made under the Pre-Negotiation Agreement following the foreclosure sale."); *see also*, Royal Manor's Motion for Summary Judgment, p. 4, RE 20, Page ID # 536 (acknowledging that following the foreclosure sale and a status conference with the district court relating to Fannie Mae's appointment of a receiver, "Royal Manor agreed to continue making NOI payments to Fannie Mae per the terms of the Pre-Negotiation Agreement.").

Detroit_4355104_1

Negotiation Agreement to apply net operating income payments from the property to Royal Manor's principal indebtedness.[16] Indeed, the Pre-Negotiation Agreement provides that Fannie Mae may use the net operating income payments in "any order and for any purpose" in its "sole and absolute discretion":

> **Fannie Mae may use the funds provided by Borrower in any order and for any purpose which is related directly or indirectly to the Loan Documents or to the Property, including, without limitation, the payment of attorneys' fees or other charges incurred by Fannie Mae**, application to principal or interest due under the note evidencing the Loan, payment for repairs or capital expenditures for the Property, or any other purpose determined by Fannie Mae in its sole and absolute discretion and in accordance with the Loan Documents.  The receipt and application of such funds by Fannie Mae shall not constitute a waiver of any amounts due under the Loan Documents or of any default in connection therewith.  [Pre-Negotiation Agreement, ¶5, RE 15-4, Page ID # 486-487 (emphasis added).]

Royal Manor made two net operating income payments under the Pre-Negotiation Agreement, which totaled $29,219.84.  Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, ¶48, RE 15, Page ID # 412.  At the time of the payments, Fannie Mae had incurred more than this amount in attorneys' fees, which were related "directly or indirectly to the Loan

---

[16] Royal Manor claimed in the district court that it was undisputed that its net operating income payments should have been credited by Fannie Mae in the calculation of the redemption amount.  Royal Manor's Motion for Summary Judgment, p. 29, RE 20, Page ID # 549.  However, Royal Manor cited no contractual provision to support its "undisputed" assertion.

31

Documents or to the Property."[17]  Thus, Fannie Mae was within its rights to, "in its sole and absolute discretion," apply the payments to attorneys' fees.  Pre-Negotiation Agreement, ¶5, RE 15-4, Page ID # 486-487.  While Fannie Mae *could have* applied these payments to principal or interest due under the Note, it was not required to.  To read paragraph five of the Pre-Negotiation Agreement as *requiring* Fannie Mae to apply net operating income payments to principal or interest due under the Note is to ignore paragraph five's permissive and discretionary language.

### b.    The District Court's Finding that the Pre-Negotiation Agreement Did Not Apply is Erroneous.

Notwithstanding the foregoing, the district court, *sua sponte*, held:

> To the extent Fannie Mae argues the Pre-Negotiation Agreement authorized attorneys' fees, it is wrong.  The Pre-Negotiation Agreement was entered into on March 18, 2013, and remained effective until the foreclosure sale.  [Net operating income] payments were made after the sale, and by then, the Pre-Negotiation Agreement was not the controlling document; Michigan's foreclosure

---

[17] For example, as a result of Royal Manor's default, Fannie Mae engaged counsel for, among other things, advice and counsel concerning Royal Manor's default, a potential workout or restructuring of the loan, the Pre-Negotiation Agreement, foreclosure proceedings, and to seek an injunction and the appointment of a receiver.  Fannie Mae's Verified Complaint, RE 1, Page ID # 1-80.  To this day, Fannie Mae continues to incur attorneys' fees in connection with the Loan Documents and intends to seek payment for those fees as provided in the parties' contracts.  *Cent. Transp., Inc. v. Fruehauf Corp.*, 139 Mich. App. 536, 549; 362 N.W.2d 823 (1984) ("A contractual provision for reasonable attorneys' fees in enforcing provisions of the contract may validly include allowance for services rendered upon appeal.").

Detroit_4355104_1

statute then controlled.  [Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 15, RE 31, Page ID # 1268.]

The district court's unsupported conclusions are fundamentally flawed for three reasons.

**First**, *Royal Manor's* express assertion that it made the two post-foreclosure net operating income payments *pursuant to the Pre-Negotiation Agreement* disproves the district court's conclusion that the Pre-Negotiation Agreement remained effective only until the post-foreclosure sale.[18]  Indeed, post-foreclosure net operating income payments are provided for *only* in the Pre-Negotiation Agreement.  To hold that they were not made pursuant to the terms of this agreement would make them gratuitous.

**Second**, contrary to the district court's statement, the Pre-Negotiation Agreement does not have a termination date.  *See generally*, Pre-Negotiation Agreement, RE 15-4, Page ID #484-491.  Instead, the Pre-Negotiation Agreement provides that either Royal Manor or Fannie Mae may terminate discussions

---

[18] Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, ¶48, RE 15, Page ID # 412 ("Fannie Mae also failed to credit Royal Manor for payments made under the Pre-Negotiation Agreement following the foreclosure sale."); *see also*, Royal Manor's Motion for Summary Judgment, p. 4, RE 20, Page ID # 536 (acknowledging that following the foreclosure sale and a status conference with the district court relating to Fannie Mae's appointment of a receiver, "Royal Manor agreed to continue making NOI payments to Fannie Mae per the terms of the Pre-Negotiation Agreement.").

Detroit_4355104_1

unilaterally.  *Id*., ¶6, Page ID # 487.  Plainly, the agreement had not been terminated post-foreclosure as evidenced by Royal Manor's post-foreclosure net operating income payments expressly made under the Pre-Negotiation Agreement and Fannie Mae's acceptance of those payments.

**Third**, the district court's conclusion that the Pre-Negotiation Agreement could be cast aside because of an unspecified but controlling Michigan foreclosure statute is plainly erroneous.  Michigan's foreclosure by advertisement statutes, M.C.L. 600.3201 *et. seq.*, govern the "prerequisites of the sale, notice of foreclosure and publication, mechanisms of the sale, and redemption."  *Senters v. Ottawa Sav. Bank, FSB*, 443 Mich. 45, 50; 503 N.W.2d 639 (1993).  A foreclosure sale affects only the mortgage and the mortgage debt.  *New Freedom Mtg. Corp. v. Globe Mtg. Corp.*, 282 Mich. App. 63, 68; 761 N.W.2d 832 (2008) ("If a mortgagee makes a full credit bid at the foreclosure sale, "*the mortgage debt is satisfied*, *and the mortgage is extinguished.*") (Emphasis added).  These statutes do not govern the rights and obligations of a party with respect to a separate and distinct contract from the Mortgage.  And, as discussed, Royal Manor's net operating income payments and Fannie Mae's right to apply those payments to attorneys' fees derives from the Pre-Negotiation Agreement, not the Mortgage or the underlying mortgage debt.  Thus, the district court's conclusion that "Michigan's foreclosure statute" supplanted the Pre-Negotiation Agreement is

Detroit_4355104_1

incorrect.

   **ii.**  **The Loan Documents**.

     **a.**  **The Loan Documents Obligate Royal Manor to Pay Fannie Mae's Out-of-Pocket Attorneys' Fees and Provide Fannie Mae Discretion to Apply Payments in Any Order**.

   The Loan Documents also support Fannie Mae's application of net operating income payments to its attorneys' fees.  As with the Pre-Negotiation Agreement, the Loan Documents expressly provide for the payment of attorneys' fees and grant Fannie Mae the right to apply payments.  The Note provides that Royal Manor shall pay attorneys' fees as follows:

    **Costs and Expenses.**  Borrower shall pay on demand all expenses and costs, including fees and out-of pocket expenses of attorneys . . . incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including  . . . judicial or non-judicial foreclosure proceeding.  [Note, ¶11, RE 1-2, Page ID # 16.]

   Further, the Note provides Fannie Mae the right to apply payments to any amount due if Royal Manor failed to meet its payment obligations:

    **Application of Payments.**  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply that payment to amounts then due and payable **in any manner and in any order determined by Lender, in Lender's discretion**.  [*Id*., ¶4, Page ID # 13 (emphasis added).]

   Based on these provisions, it was proper for Fannie Mae to apply the two net

35

operating income payments to its attorneys' fees instead of to principal. Fannie Mae incurred attorneys' fees totaling more than $29,219.84 as a result of Royal Manor's default or in connection with efforts to collect amounts due under the Note or enforce the provisions of the Loan Documents.[19]   The Note obligates Royal Manor to pay these fees. Note, ¶11, RE 1-2, Page ID #16. Further, at the time the net operating income payments were made, Royal Manor was in default. This unequivocally provided Fannie Mae authority to apply the two net operating income payments, at its discretion, to its attorneys' fees. *Id*. Thus, Royal Manor's argument that its payments should have been applied to pay principal as opposed to Fannie Mae's attorneys' fees, fails.

### b.     Fannie Mae Satisfied All Condition Precedents Under the Loan Documents to Obtain Attorneys' Fees.

While ostensibly agreeing that attorneys' fees were provided for in the Loan Documents, the district court determined that the two net operating income payments could not be applied to attorneys' fees. Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 16, RE 31, Page ID # 1269. The district court reasoned that application of the payments to attorneys' fees was improper because Fannie Mae did not make a demand for such fees. *Id*., p. 15, Page ID # 1268. Further, Fannie Mae did not file

---

[19] *See supra*, n. 17.

36

a "motion for attorneys' fees," which, according to the district court, is "typical." *Id*. The district court's reasoning is in error.

The district court's *sua sponte* pronouncement that Fannie Mae failed to make a demand is factually incorrect. On March 11, 2013, Fannie Mae notified Royal Manor that its failure to pay the full indebtedness due under the Note constituted an Event of Default. Demand Letter, RE 1-5, Page ID #76-80. The letter also demanded costs and attorneys' fees. *Id*. ("Demand is hereby made for immediate payment in full of the entire unpaid principal balance of the Note, plus (to the extent lawful) accrued and unpaid interest thereon and the costs of attorneys' fees of Fannie Mae."). A "demand" is defined as "the assertion of a legal or procedural right." Black's Law Dictionary (9th ed. 2009). Unmistakably, Fannie Mae's Demand Letter asserted its legal right to attorneys' fees.[20]

The district court's theory that Fannie Mae's entitlement to attorneys' fees was dependent on it filing a motion is simply wrong. The Loan Documents do not condition the payment of attorneys' fees on Fannie Mae filing a motion. *See*, Note, ¶11, RE 1-2, Page ID # 16. Indeed, no law requires a motion to be filed gain the benefit of one's bargain. Simply put, the district court's assertion that a motion

---

[20] Even if the district court was correct regarding the demand, the Pre-Negotiation Agreement – a separate and independent basis that entitles Fannie Mae to attorneys' fees – does not condition the payment of attorneys' fees on Fannie Mae making a demand.

37

was required to be filed circumvents Fannie Mae's clear contractual right to be reimbursed out-of pocket expenses of attorneys and should be reversed.

## III. Default Interest Applied to the Indebtedness Not Paid in Full on the Maturity Date.

### A. Default Interest Rate Applies.

The affidavit as to amounts needed for redemption stated that the property could be redeemed by paying the amount bid plus interest from the foreclosure sale at the default interest rate of 9.74%. Affidavit as to Amounts Needed for Redemption, RE 20-6, Page ID # 639-641. Royal Manor paid the default interest rate to redeem the property, which amounted to $17,652.80. Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim, RE 15, ¶23, Page ID # 407. Royal Manor claims that it was overcharged for interest following the foreclosure sale by $8,026.71. Royal Manor's Motion for Summary Judgment, p. 37, RE 20, Page ID # 557. The claim is premised on two arguments. First, that the principal to which the interest rate was applied was overstated because it included the "unreasonable" late charge of $84,761.82 and failed to further reduce the principal by the post-foreclosure net operating income payments of $29,219.84. *Id*., p. 36, Page ID # 556. Second, Royal Manor claimed, and the district court seemingly agreed,[21] that the interest rate should have been 5.74% as opposed to

---

[21] The district court did not opine as to why it believed the 5.74% interest rate applied as opposed to the applicable 9.74% interest rate. *See*, Order Denying

Detroit_4355104_1

9.74%. *Id*., pp. 555-556, Page ID # 35-36.  As to the first argument, the late charge was applicable and the net operating income payments were properly applied to attorneys' fees.  *See*, discussion *supra* Section I and II.  Thus, interest was properly applied to those amounts.  As to the second argument, Royal Manor is simply incorrect.

The interest charged during this period is governed by Michigan statute.  The statute provides that Royal Manor was entitled to redeem the property by paying "the sum that was bid for the entire premises sold, with interest from the date of the sale at the *interest rate provided for by the mortgage . . . .*"  M.C.L. § 600.3240(2) (emphasis added).

Here, the Mortgage incorporated the Note by reference.  Mortgage, ¶5, RE 1-3, Page ID # 40.  The Note provided two distinct interest rates depending on whether Royal Manor was compliant with its obligations under the Loan Documents.  If Royal Manor was compliant with its loan obligations, interest was payable at the annual rate of 5.74%.  Note, p. 1, RE 1-2, Page ID # 12.  But, if Royal Manor was not compliant with its loan obligations, the default interest rate of 9.74% applied.  *See*, *id*., ¶7, Page ID # 13 ("[S]o long as any monthly installment or any other payment due under this Note remains past due for 30 days

Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment, p. 16, RE 31, Page ID # 1269.

Detroit_4355104_1

or more," interest shall accrue at the annual rate of 9.74%.).  *Id*.  The Note specifically provided that the default interest rate applied to any principal and interest due after the maturity date.  *Id*., ¶8, Page ID # 13 ("If the unpaid principal balance and all accrued interest are not paid in full on the Maturity Date, the unpaid principal balance and all accrued interest shall bear interest from the Maturity Date at the Default Rate.").

The foreclosure sale occurred after the maturity date of the loan.  At that time, Royal Manor was not compliant with its loan obligations.  Thus, the default interest rate of 9.74% applied.  Note, ¶8, RE 1-2, Page ID # 13.  The default interest rate was the specific rate incorporated into the Mortgage.  Therefore, under M.C.L. 600.3240(2), the default interest rate was the proper interest rate to apply for the period following the foreclosure sale until redemption.  Royal Manor was not overcharged for interest during this period and the district court's decision to the contrary should be reversed.

## CONCLUSION

Based on the foregoing, Fannie Mae requests that this Court reverse the district court's denial of Fannie Mae's motion to dismiss.  Fannie Mae's inclusion of the late fee, together with its application of Royal Manor's post-foreclosure payments to its attorneys' fees was merited by the parties' contracts.  The default rate of interest was also properly applied following the foreclosure sale.

Accordingly, the district court's grant of summary judgment in favor of Royal

Manor should be vacated, and the case remanded for entry of an order dismissing

the case for failure to state a claim upon which relief can be granted.  Alternatively,

summary judgment should be entered in favor of Fannie Mae pursuant to Fed. R.

Civ. P. 56(f)(1).

                                                Respectfully submitted,

                                                BODMAN PLC

                                                By: /s/Thomas J. Rheaume, Jr.
                                                     Dennis J. Levasseur (P39778)
                                                     Thomas J. Rheaume, Jr. (P74422)
                                                1901 St. Antoine Street
                                                6th Floor at Ford Field
                                                Detroit, Michigan 48226
                                                dlevasseur@bodmanlaw.com
                                                trheaume@bodmanlaw.com
                                                (313) 259-7777
October 9, 2014                                 Attorneys for Appellant

Detroit_4355104_1

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the typeface and length requirements of Fed. R. App. P. 32(a)(5) and (a)(7).   This brief has been prepared in a proportionally spaced typeface using Word Times New Roman font in 14 point pitch and contains 10,441 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 9, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

/s/Thomas J. Rheaume, Jr.
Dennis J. Levasseur (P39778)
Thomas J. Rheaume, Jr. (P74422)
1901 St. Antoine Street
6th Floor at Ford Field
Detroit, Michigan 48226
dlevasseur@bodmanlaw.com
trheaume@bodmanlaw.com
(313) 259-7777
Attorneys for Appellant

42

Detroit_4355104_1

## <u>DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS</u>

Plaintiff/Counter-Defendant/Appellant designates the following relevant district court documents cited in this brief:

| Description of Entry | Record Entry No. | Page ID # Range |
|---|---|---|
| Fannie Mae's Verified Complaint | 1 | 1-80 |
| Note | 1-2 | 12-23 |
| Mortgage | 1-3 | 25-69 |
| Assignment of Mortgage | 1-4 | 71-74 |
| Demand Letter | 1-5 | 76-80 |
| Royal Manor's First Amended Verified Answer, Affirmative Defenses and Counterclaim | 15 | 387-422 |
| Pre-Negotiation Agreement | 15-4 | 484-491 |
| Royal Manor's Motion for Summary Judgment | 20 | 509-749 |
| Sheriff's Deed on Foreclosure Sale | 20-5 | 628-637 |
| Affidavit as to Amounts Needed for Redemption | 20-6 | 639-641 |
| Foreclosure Bid Calculation | 20-8 | 648 |
| Fannie Mae's Motion to Dismiss Royal Manor's Counterclaims | 21 | 750-892 |
| Stipulated Order of Dismissal Without Prejudice of Fannie Mae's Complaint and Counts III and IV of Royal Manor's Counterclaim Only | 24 | 1179-1180 |

Detroit_4355104_1

| | | |
|---|---|---|
| Order Denying Fannie Mae's Motion to Dismiss and Granting Royal Manor's Motion for Summary Judgment | 31 | 1254-1270 |
| Judgment | 32 | 1271 |
| Notice of Appeal | 33 | 1272 |